T.C. Memo. 2002-119


UNITED STATES TAX COURT


GERALD L. AND ERMA L. DUNNEGAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 8072-00.              Filed May 14, 2002.


<u>David K. Holmes</u>, for petitioners.

<u>Elizabeth Downs</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


COHEN, <u>Judge</u>:  Respondent determined deficiencies in petitioners' Federal income tax and penalties under section 6662(a) as follows:

| Year | Deficiency | Penalty, I.R.C. Sec. 6662(a) |
|------|-----------|------------------------------|
| 1993 | $135,811 | $2,815.80 |
| 1994 | 3,628 | 725.60 |
| 1995 | 16,088 | 2,042.20 |

After concessions by the parties, the issues remaining for decision are: (1) Whether the monetary transfers that petitioners made to a corporation are capital contributions or are bona fide debts that are deductible as business bad debts under section 166 when they became worthless; (2) whether the net profits and losses of petitioners' fireworks businesses are attributable to Mr. Dunnegan or Mrs. Dunnegan for purposes of self-employment tax; and (3) whether payments made to a charitable organization are business expenses or charitable contributions.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.

Gerald L. and Erma L. Dunnegan (petitioners) resided in Wichita, Kansas, when their petition was filed. Petitioners filed joint Federal income tax returns for the years in issue.

Petitioners and their son, Gregory Dunnegan, owned all of the stock of Auto Plaza East, Inc. (Auto Plaza), which was incorporated in April 1991. Petitioners were the majority shareholders in Auto Plaza. Mr. Dunnegan was the president and Mrs. Dunnegan was the secretary of Auto Plaza. The primary business activity of Auto Plaza was the purchase and resale of used cars.

Beginning in 1991, petitioners transferred funds to Auto Plaza to cover operating expenses and to purchase vehicle inventory. The funds were transferred to Auto Plaza in increments and on an "as needed" basis, depending on the vehicles purchased and the vehicles still in inventory. The funds received by Auto Plaza from petitioners were recorded as "loans from shareholders" in the bookkeeping records.

There were no notes reflecting the transfers from petitioners to Auto Plaza. No collateral was provided by Auto Plaza to petitioners with respect to the transfers. There was no fixed repayment schedule between petitioners and Auto Plaza with respect to the transfers. Petitioners received payments from Auto Plaza only when funds were available, but they advanced more than was repaid. No record of repayments was maintained.

Auto Plaza attempted to obtain financing from several banks for its inventory but was not able to obtain traditional bank financing without a personal guaranty from petitioners. Auto

Plaza could not obtain loans from banks on the same terms as the funds provided by petitioners.

In 1993, Mr. Dunnegan forgave, or permitted Auto Plaza to write off, $700,000 of the accumulated transfers that were recorded as shareholder loans, in an effort to improve the corporation's debt equity ratio and to make the corporation viable. Auto Plaza discontinued its business activities in 1994.

Petitioners deducted the bad debt expense on Schedule C for a "loans and collections" business. Petitioners filed two separate returns for 1993 claiming $700,000 in bad debt expense on the return filed on July 3, 1995, and $370,000 in bad debt expense on the return filed on September 28, 1995. (The Court requested that petitioners provide an explanation for the filing of the two different tax returns in their brief, but no explanation was provided.) Petitioners also claimed bad debt expense of $246,175 in 1994.

Petitioners are in the business of selling fireworks, both wholesale and retail. The retail stores are located in Dennings and Moriarty, New Mexico; in Wyoming; and in Wichita and Kansas City, Kansas.

Mr. Dunnegan worked 60 or more hours per week for Auto Plaza, except during fireworks season when he spent half his time performing activities related to the fireworks businesses. His

activities included processing the orders of other wholesalers or retailers.

Mrs. Dunnegan worked 30 to 45 hours per week for Auto Plaza performing accounting, preparing title work, and preparing sales tax reports. She also spent about 25 to 40 hours per week on activities related to the fireworks businesses, except between May and July when she worked 50 hours or more per week in the fireworks businesses. Mrs. Dunnegan's duties that were related to the fireworks activities were conducted in her home and consisted of accounting and bookkeeping services, determining the orders for the following year, placing the overseas orders, helping to pack the orders, and monitoring shipments. Mrs. Dunnegan performed 100 percent of the bookkeeping for the Moriarty store.

The fireworks businesses are operated as sole proprietorships, and the income and expense for each location is reported on a Schedule C, Profit or Loss From Business. On petitioners' Schedules C for 1993, both Mr. and Mrs. Dunnegan are listed as the proprietors of the Moriarty, Dennings, and Kansas City fireworks businesses. Petitioners attributed 50 percent of the net profit and loss from these fireworks businesses to Mrs. Dunnegan.

J&G Enterprise is a sole proprietorship of Mr. Dunnegan that engages in the sale of fireworks. The income and expenses of the

activities of J&G Enterprise are reported on a separate Schedule C. Two checks in the amount of $2,500 each were written to Big Brothers/Big Sisters. The checks bore notations that they were for "donations". Big Brothers/Big Sisters is a charitable organization. Big Brothers/Big Sisters assisted J&G Enterprise in finding a place for people to use the fireworks products, provided the labor to help with parking and traffic, and provided labor to meet the customers who came into the retail store. Petitioners deducted the $5,000 that was paid to Big Brothers/Big Sisters as promotions expense on their Schedule C for J&G Enterprise in 1993.

Among the adjustments determined in the notice of deficiency, respondent disallowed deductions for bad debts of $370,000 and $246,175 for 1993 and 1994, respectively, on the Schedule C for the "loans and collections" business. Respondent determined that the net income or loss from the Schedule C businesses was solely attributable to Mr. Dunnegan for self-employment tax. Respondent disallowed $5,000 of the promotions expense that related to J&G Enterprise in 1993.

OPINION

Petitioners expressly conceded some of the adjustments that were determined by respondent in the notice of deficiency. Those adjustments support the penalties imposed under section 6662(a). All of the other adjustments that were not addressed by

petitioners at trial or on brief are deemed conceded.  The issues that petitioners addressed at trial or in their brief are considered below.  Petitioners failed to file a reply brief ordered by the Court.

I.  Business Bad Debt

The first issue is whether the monetary transfers that petitioners made to Auto Plaza are capital contributions or are bona fide debts that are deductible as business bad debts under section 166 when they became worthless.

Generally, taxpayers are allowed deductions for bona fide debts owed to them that become worthless during a year.  Sec. 166(a).  Bona fide debts generally arise from valid debtor-creditor relationships reflecting enforceable and unconditional obligations to repay fixed sums of money.  Sec. 1.166-1(c), Income Tax Regs.  For purposes of section 166, contributions to capital and equity investments in corporations do not constitute or qualify as bona fide debts.  Kean v. Commissioner, 91 T.C. 575, 594 (1988).

The question of whether transfers of funds to closely held corporations constitute debt or equity in the hands of the recipient corporations must be decided on the basis of all of the relevant facts and circumstances.  Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980).  Courts have established a list of nonexclusive factors to consider when evaluating the

nature of transfers of funds to closely held corporations, as follows: (1) The names given to the documents that would be evidence of the purported loans; (2) the presence or absence of fixed maturity dates with regard to the purported loans; (3) the likely source of any repayments; (4) whether the taxpayers could or would enforce repayment of the transfers; (5) whether the taxpayers participated in the management of the corporations as a result of the transfers; (6) whether the taxpayers subordinated their purported loans to the loans of the corporations' creditors; (7) the intent of the taxpayers and the corporations; (8) whether the taxpayers who are claiming creditor status were also shareholders of the corporations; (9) the capitalization of the corporations; (10) the ability of the corporations to obtain financing from outside sources at the time of the transfers; (11) how the funds transferred were used by the corporations; (12) the failure of the corporations to repay; and (13) the risk involved in making the transfers. <u>Calumet Indus., Inc. v. Commissioner</u>, 95 T.C. 257, 285 (1990); <u>Dixie Dairies Corp. v. Commissioner</u>, <u>supra</u> at 493.

The above factors serve only as aids in evaluating whether taxpayers' transfers of funds to a closely held corporation should be regarded as risk capital subject to the financial success of the corporation or as bona fide loans made to the corporation. <u>Fin Hay Realty Co. v. United States</u>, 398 F.2d 694,

697 (3d Cir. 1968).  No single factor is controlling.  Dixie Dairies Corp. v. Commissioner, supra at 493.

Petitioners argue that all of the funds that petitioners transferred to Auto Plaza constituted bona fide business loans that became worthless and therefore the bad debts qualify for a business bad debt deduction under section 166.  Respondent argues that petitioners' transfers of funds to Auto Plaza should be treated as capital contributions and, thus, petitioners should not be allowed to claim a bad debt deduction under section 166.

When petitioners made the transfers to Auto Plaza, no loan agreements or promissory notes were drafted or executed.  The absence of notes or other instruments favors respondent.  See Calumet Indus., Inc. v. Commissioner, supra at 286.

Petitioners argue that the transfers were recorded as "loans from shareholders" on the corporation's books and records.  Transfers to closely held corporations by controlling shareholders are subject to heightened scrutiny, and labels attached to such transfers by the controlling shareholders through bookkeeping entries or testimony have limited significance unless these labels are supported by objective evidence.  Fin Hay Realty Co. v. United States, supra at 697; Dixie Dairies Corp. v. Commissioner, supra at 495.  Here, petitioners were the majority shareholders of the corporation

and, thus, the recordation of the loan was merely a bookkeeping entry that is of little significance.

There was no fixed repayment schedule, and petitioners did not produce a record of the repayments. Additionally, the repayment of petitioners' transfers depended upon Auto Plaza's financial success, and the lack of repayment indicates that the transfers did not constitute bona fide loans. See Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d 634, 639 (11th Cir. 1984), affg. T.C. Memo. 1982-314. "If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution." Roth Steel Tube Co. v. Commissioner, 800 F.2d 625, 631 (6th Cir. 1986), affg. T.C. Memo. 1985-58.

Petitioners never demanded repayment of the transfers, and their continued lending of additional funds tends to refute the existence of a valid debtor-creditor relationship between Auto Plaza and petitioners with regard to the funds transferred to Auto Plaza. See, e.g., Boatner v. Commissioner, T.C. Memo. 1997-379, affd. without published opinion 164 F.3d 629 (9th Cir. 1998).

Auto Plaza tried to obtain financing from banks but could not obtain financing on the same terms as the funds provided by petitioners. Where the banks would have required a personal guaranty from petitioners, Auto Plaza did not give any security

or execute any security agreements to collateralize the monetary transfers.

Petitioners rely on Litwin v. United States, 983 F.2d 997 (10th Cir. 1993); however, Litwin decided whether a bona fide debt was business or nonbusiness, not a question of whether a bona fide debt existed.  Our conclusion is consistent with the analysis and holding in Jensen v. Commissioner, T.C. Memo. 1997-491, affd. without published opinion 208 F.3d 226 (10th Cir. 2000).  In Jensen, the Court held that the funds transferred by the taxpayers to a closely held corporation were not bona fide debts and not deductible as business bad debts under section 166(a).  The Court of Appeals affirmed this Court's holding in Jensen, which applied the relevant factors to the facts of that case as set forth in Calumet Indus., Inc. v. Commissioner, supra at 285.

Based on the evidence, we conclude that petitioners' monetary transfers to Auto Plaza did not constitute bona fide loans, and, therefore, the transfers should be treated as capital contributions.  Petitioners may not take a deduction for bad debt under section 166.

## II.  Self-Employment Tax

The next issue is whether the net profits and losses of petitioners' Schedule C businesses are attributable to

Mr. Dunnegan or Mrs. Dunnegan for purposes of self-employment tax under section 1401.

Petitioners attributed 50 percent of the profit and loss from the Schedules C for the fireworks businesses located in Moriarty, Dennings, and Kansas City to Mrs. Dunnegan in 1993. Respondent determined that 100 percent of the net profits and losses from the Schedules C for the fireworks businesses was attributable to Mr. Dunnegan for self-employment tax purposes. Respondent argues that there is no evidence that Mrs. Dunnegan was involved in the management of the businesses or had any significant responsibility for the income-generating activities of the businesses.

Section 1401(a) imposes a tax on an individual's self-employment income. See also sec. 1402(b). Net earnings from self-employment is the gross income derived by an individual from a trade or business carried on by that individual, less certain deductions. See O'Rourke v. Commissioner, T.C. Memo. 1993-603, affd. without published opinion 60 F.3d 834 (9th Cir. 1995). We have previously stated:

> With respect to individuals who are married, only the spouse carrying on the trade or business will be subject to the self-employment taxes. The question of which spouse carries on the trade or business is a question of fact to be determined on a case-by-case basis. * * *

Jones v. Commissioner, T.C. Memo. 1994-230, affd. without published opinion 68 F.3d 460 (4th Cir. 1995); see O'Rourke v. Commissioner, supra.

Mrs. Dunnegan testified that she was intensely involved in the operation and management of the fireworks businesses. She spent approximately 25 to 40 hours per week performing services for the Schedule C businesses, such as bookkeeping, placing orders to suppliers, and packing and shipping orders. Petitioners listed both Mr. Dunnegan and Mrs. Dunnegan as the proprietors of the fireworks businesses on their Schedules C for 1993. We conclude that both spouses were carrying on the fireworks business and 50 percent of the net profits and losses from the fireworks businesses should be attributable to Mrs. Dunnegan for purposes of self-employment tax under section 1401.

III.  Business Expenses

The last issue is whether the $5,000 paid by petitioners to Big Brothers/Big Sisters is deductible as a business expense under section 162 or as a charitable contribution under section 170. Petitioners claim that they are entitled to the deduction for business expense under section 162 for the payments because they were made in exchange for promotional services and labor rendered to J&G Enterprise.

The term "charitable contribution" as used in section 170 has been generally held synonymous with the term "gift". Considine v. Commissioner, 74 T.C. 955, 967 (1980).  A gift is generally defined as a voluntary transfer of property by the owner to another without consideration therefor.  If a payment proceeds primarily from the incentive of anticipated benefit to the payor beyond the satisfaction that flows from the performance of a generous act, it is not a gift.  If the transfer is impelled primarily by the anticipation of some economic benefit or is in fact an exchange in the form of a substantial quid pro quo, it is not a contribution.  Id.

In determining whether a statutory contribution or gift was made, the primary factor is the transferor's dominant motive or intention in making the transfer.  Commissioner v. Duberstein, 363 U.S. 278, 286 (1960).  Identification of the dominant motive for the transfer must be made on the basis of all of the facts. United States v. Am. Bar Endowment, 477 U.S. 105, 116-118 (1986); Commissioner v. Duberstein, supra at 289.

We are persuaded that the payments to the charitable organization were not charitable contributions under section 170, because petitioners' business expected to receive certain services in return.  The understanding between Mr. Dunnegan and Big Brothers/Big Sisters was that Big Brothers/Big Sisters would provide promotional services and labor to J&G Enterprise, and

such services were actually received.  In addition, the services rendered by the charitable organization were ordinary and necessary to the operation of J&G Enterprise.  We conclude that the payments are deductible as a business expense under section 162.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155.</u>